**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL MALLOY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-5686 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| WALGREEN CO., NEWPORT GROUP, | ) | |
| INC., and WALGREEN CO. 1988 | ) | |
| EXECUTIVE DEFERRED | ) | |
| COMPENSATION/CAPITAL | ) | |
| ACCUMULATION PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In his governing first amended complaint [1-1] at 49 et seq. ("Complaint"), Plaintiff Daniel Malloy ("Plaintiff") brings suit against Walgreen Co. ("Walgreen"), Newport Group, Inc. ("Newport"), and Walgreen Co. Executive Deferred Compensation/Capital Accumulation Plan (the "Plan") (collectively, "Defendants") for various state and federal claims arising out of Defendants' refusal to pay Plaintiff retirement benefits that he is allegedly owed pursuant to the terms of the Plan. Currently before the Court is Defendants' motion to dismiss the complaint for failure to state a claim [9]. For the following reasons, Defendants' motion to dismiss [9] is denied. Plaintiff's joint status report, which should include a discovery plan and statement regarding settlement discussions to date and settlement potential, is due by August 3, 2021.

**I.      Background**

The following facts are drawn from the Complaint. All well-pled facts are presumed to be true for purposes of Defendants' motions to dismiss. See *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). Plaintiff is an Illinois resident. Defendant Walgreen is an Illinois

corporation with its principal place of business and corporate headquarters in Illinois. Defendant Newport is the administrator of the Plan, which was created by Walgreen for certain Walgreen employees.

Plaintiff began working for Walgreen in 1972 as a dishwasher at Walgreen's restaurant in Hammond, Indiana, when he was a teenager. Plaintiff was promoted numerous times, raising through the ranks of assistant manager, general manager of various Walgreen's restaurant locations, district manager overseeing up to eight restaurants, and, in 1987, to Director of Food Service Administration. In 1988, Plaintiff was a Walgreen's Salary Grade 14 employee and therefore qualified to participate in the Plan. On January 1, 1988, Plaintiff paid the required consideration of $6,514.00, deducted from his paycheck, to participate in the Plan.

According to the Complaint, the Plan "provided for annual interest rates for projected payments between 19.00 – 24.00% compounded annually depending upon the age at time of deferral." [1-1] at 51. Pursuant to the Plan, "the agreed projected payments to Plaintiff were … four Interim Payments once per year from 1995-1998, and fifteen Installment Payments once per year after age 65." *Id*. at 52. The Complaint alleges that the payments from 1995 to 1998 were to be $6,514.00 each year and the payments from 2022 to 2036 were to be $29,454.00 each year, for total projected payments of $467,866.00. *Id*. at 52-53.

Subsection 4.C(2) of the Plan, as summarized by the Complaint, provides that Walgreen was obligated to pay an employee who was involuntarily terminated in the amount of his deferred compensation accumulating at 20% interest compounded annually. [1-1] at 54. In June 1988, Walgreen sold its Food Service Division, including all Walgreen's restaurants, to the Marriott Corporation ("Marriott"). Plaintiff's employment with Walgreen therefore ended in October 1988. However, Plaintiff continued as Director of Food Service Administration for Marriott. According

to the Complaint, Walgreen never paid Plaintiff the lump sum payment allegedly due to him under Subsection 4.C(2) of the Plan.

In January of each subsequent year, including in 2018, 2019, and 2020, Plaintiff received a letter from Walgreen making representations to him of his projected payments under the Plan. [1-1] at 55. Additionally, on the first of January in each year between 1995 and 1998, Walgreen paid Plaintiff an Interim Payment of $6,514.00, as provided for in the Plan. When Plaintiff planned for his retirement, he relied on Walgreen's representations that he would also receive Installment Payments of $29,454.00 each for fifteen years upon reaching age 65. Plaintiff turned 65 on May 13, 2021. According to the Complaint, other Walgreen employees whose employment ended with the sale of the Walgreen Food Service Division received their Installment Payments under the Plan.

In April 2019, Walgreen "slashed its forecast for 2019 earnings to flat from previous guidance of 7-12 percent for full year earnings in 2019, and announced that Walgreen Co. planned to cut costs by more than $1.5 billion by 2022." [1-1] at 56. In October of that year, Walgreen announced that it was laying off employees at its corporate headquarters, cutting bonuses for store managers, and planned to cut more than $1.8 billion by 2022. In the third quarter of 2020, Walgreen reported a $1.7 billion GAAP Net Earnings loss, down 266.6% compared to the third quarter of 2019.

In June 2020, Walgreen, through its agent Kristin A. Blumka, Senior Analyst, Retirement Plans, "made the material misrepresentation to Plaintiff that he did not meet the eligibility criteria for the Plan." [1-1] at 57. She also acknowledged to Plaintiff that Walgreen never made the lump sum payment to him as set forth in Subsection 4.C.(2) of the plan. She further advised Plaintiff that "Walgreen elected to exercise the provisions of Subsection 4.C.(2) of the Plan, which required

3

Walgreen to pay Plaintiff the principal of his deferral amounts plus accrued interest at the rate found in the provisions of Subsection 4.C(2) of the Plan." *Id.* Blumka allegedly promised Plaintiff that Walgreen would "do the right thing" and that she would discuss Plaintiff's compensation with Walgreen's general counsel. Plaintiff calculates that the lump sum payment he would be entitled to would be at least $2,671,953, which is his 1988 deferred compensation payment of $6,514.00 plus twenty percent interest compounded annually. See *id.* at 58.

On July 14, 2020, Blumka informed Plaintiff that he "did not meet the eligibility criteria for the Plan because he did not attain 'retirement status' by 'attaining age 55 with at least 10 years of service prior to termination of employment with Walgreens." [1-1] at 59. She also told Plaintiff that he did not qualify for the Interim Payments that he had already received between 1995 and 1998 and did not qualify for the Installment Payments that were to begin in 2022. Instead, Blumka told Plaintiff, the amount due to him under Subsection 4.C.(2) of the Plan was $7,527.69. Blumka asserted that this payment had already been satisfied through Plaintiff's receipt of Interim Payments from 1995 to 1998 and that he would be receiving no further payments. Blumka informed Plaintiff that the communications he had received from Walgreen over the preceding 32 years were "not properly administered," an "error that occurred in the administration of your benefits," and "administrative error." *Id.* at 60. She further informed Plaintiff that Walgreen had a right to reimbursement for the Interim Payments made from 1995 through 1998, which Plaintiff perceived as a threat intended to prevent him from seeking to enforce Walgreen's obligations under the Plan.

Based on Defendants' alleged failure to pay him amounts due under the Plan, Plaintiff asserts six legal theories for recovery, the first five under Illinois state law and the sixth under federal law: breach of fiduciary duty of good faith and fair dealing (Count I); fraud and deceit

(Count II); conversion (Count III); violation of the Illinois Wage Payment and Collection Act (Count IV); breach of contract (Count V); and a claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), and federal common law to enforce the Plan (Count VI). Under the first five legal theories, Plaintiff seeks $2.5 million in damages and reserves the right to request punitive damages. In the ERISA count, Plaintiff seeks to enforce the terms of the Plan. Currently before the Court is Walgreen's and the Plan's motion to dismiss [9], in which Newport has joined. See [28] & [32].

## II. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that, to state a claim for relief, a complaint "must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." "The questions under [this rule] are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). However, this "tenet … is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, which "can [be] reject[ed] at the motion to dismiss stage." *Dix v. Edleman Financial Services, LLC*, 978 F.3d 507, 514 (7th Cir. 2020).

The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The Court may also consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621 (7th 2020). In the event of a conflict between the complaint and "an attachment thereto that forms the basis of the plaintiffs' claims, the attachment prevails." *London v. RBS Citizens, N.A.*, 600 F.3d 742, 747 n.5 (7th Cir. 2010). In opposing a Rule 12(b)(6) motion, a plaintiff is "free to 'elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

## III. Analysis

### A. ERISA Claim

In Count VI of his Complaint, Plaintiff brings suit under 29 U.S.C. § 1132(a)(1)(B) and federal common law to recover benefits allegedly due to him under the Plan, enforce his rights under the terms of the Plan, and declare his rights to future benefits under the terms of the Plan. See [1-1] at 67-68. Defendants argue that Plaintiff's ERISA claim must be dismissed because the Plan provides Walgreen with discretion to interpret and implement all aspects of the Plan; Walgreen's interpretation of the Plan, as communicated to Plaintiff by Blumka, was correct; and, therefore, Plaintiff has already been paid more than he was due under the Plan. In particular, Defendants maintain that "[a]t the time of his 1988 termination, Walgreens owed Plaintiff $7,527.69." [10] at 12. Although "[t]he Plan did not pay him the money in 1988 due to an error, … it paid him over $26,000 in interim payments (to which he was not entitled) between 1995 and 1998." *Id*. Defendants deny that the Plan entitles Plaintiff to either (a) the Installment Payments

6

that would have begun in 2022 and given Plaintiff a total payout of $467,866.00; or (b) the $2.5 million Plaintiff seeks in his Complaint, which is roughly equivalent to the lump sum payment he allegedly should receive based on his 1988 deferred compensation payment of $6,514.00 plus twenty percent interest compounded annually to date.

Defendants correctly point out that where the benefits plan gives the administrator authority to determine eligibility for benefits or to construe the terms of the plan, then the administrator's benefits determination is subject to an "abuse of discretion" standard. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017); *Siebert v. Central States Southeast & Southwest Areas Health & Welfare Fund*, 496 F. Supp. 3d 1152, 1157 (N.D. Ill. 2020). "Under that deferential standard of review, the Court: must uphold the decision so 'long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Siebert*, 496 F. Supp. 3d at 1157 (quoting *Rabinak v. United Bhd. of Carpenters Pens. Fund*, 832 F.3d 750, 753 (7th Cir. 2016)).

Defendants maintain, and Plaintiff does not dispute, that the Plan at issue here gives the Plan administrator "[f]ull power and authority to construe, interpret, and administer the Plan" and provides further that "[e]ach determination provided for in the Plan shall be made in the absolute discretion of the [administrator]." [10] at 10 (citing Plan Art. 1, 19). Nonetheless, the Court concurs with Plaintiff that there are several reasons why it cannot determine at this early stage of the case that Defendants' interpretation of the Plan is correct or that Plaintiff has already received all that he is due (and more) under the Plan.

7

As an initial matter, it is not apparent based on either the Complaint or any records of which the Court may properly take judicial notice that the determination decisions of Ms. Blumka must, necessarily, be taken as the decision of the "Plan administrator." As Plaintiff emphasizes, the Plan vests only the "the Compensation Committee of the Walgreen Board of Directors with discretionary authority to interpret and administer the Plan." [33] at 2. Neither the Complaint nor the letters Ms. Blumka sent Plaintiff show that she was acting for or with the authorization of the Compensation Committee. The Complaint also alleges some facts that plausibly suggest that Ms. Blumka's decision is at odds with how the Compensation Committee interprets the Plan, or at least how it interpreted the Plan in the past. According to Plaintiff, "from 1988 to 2020, the 'Plan administrator' interpreted the Plan exactly as Malloy argues it should be interpreted and continually promised to pay him the benefits under Article 4.A.(1)(b)." [33] at 2. Further, Plaintiff maintains, both he and other Walgreen employees whose employment ended with the sale of the Walgreen Food Service Division received their Installment Payments under the Plan. *Id.* at 6. Blumka's communications informing Plaintiff that he was not entitled to benefits was an about-face from the alleged prior communications and payment decisions. Given these allegations, the Court cannot presume, as Defendants urge, that Ms. Blumka's decisions must be construed as the decisions of the Compensation Committee of the Walgreen Board of Directors simply because Ms. Blumka is an employee of Walgreen rather than an employee of some third-party benefits administrator, as in the case cited by Plaintiff. See [33] at 10-12 (citing *Hampton v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 18-cv-6725 (N.D. Ill. Oct. 7, 2020)).

Defendants emphasize that "[t]he Plan grants the administrator '[f]ull power and authority to … administer the Plan' and 'to promulgate such rules and regulations … necessary and appropriate' to implement the Plan." [34] at 8. But citation to these provisions simply begs the

question whether the Compensation Committee has properly delegated Ms. Blumka as the authority to deny Plaintiff benefits. In other words, the question remains whether, under the facts of this case, the Compensation Committee "effectively delegated its discretion" to Ms. Blumka; if not, her decision would be subject to *de novo* review in this Court. *Gavin v. Life Ins. Co. of, North America*, 2013 WL 677886, at *2 (N.D. Ill. Feb. 25, 2013); see also generally *Firestone Tire*, 489 U.S. at 115; *Siebert*, 496 F. Supp. 3d at 1157.

Even if the Court were to assume Ms. Blumka was properly delegated the authority to deny benefits to Plaintiff, the Court cannot rule out the possibility that she (or Walgreen more generally) may have a conflict of interest that must be considered in evaluating the reasonableness of the benefits denial decision. Defendants repeatedly assert in their briefs that "Walgreens has discretion to deny benefits," [10] at 9, [34] at 7, even though Walgreen is not itself the Plan administrator. The Supreme Court has emphasized that where "the entity that administers the plan … both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," this "dual role creates a conflict of interest" that the reviewing court "should consider … as a factor in determining whether the plan administrator abused its discretion in denying benefits." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); see also *Carlson v. Northrop Grumman Corp.*, 196 F. Supp. 3d 830, 836 (N.D. Ill. 2016). The existence of a conflict "can act as a tiebreaker when the other factors are closely balanced." *Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 440 (7th Cir. 2019).

Finally, the Complaint, viewed along with the Plan documents and other evidence provided by the parties, plausibly suggests that Walgreen's decision to deny Plaintiff benefits may have been arbitrary and capricious. *Cochran*, 828 F.3d at 776. Before turning to the specific contractual language of the Plan, the Court notes that "[u]niform interpretation and application of plan rules

are important factors in deciding … whether a denial of benefits is arbitrary and capricious." *Carlson*, 196 F. Supp. 3d at 835-36. Indeed, the Seventh Circuit has recognized that "[i]nterpretation of the same plan term in different ways is 'paradigmatically arbitrary and capricious.'" *Id.* (quoting *Schane v. Int'l Bhd. of Teamsters Union Local No. 710 Pension Fund Pension Plan*, 760 F.3d 585, 591–92 (7th Cir. 2014)). Thus, Walgreen's representations to Plaintiff from 1988 to 2020 about his projected payments under the Plan, its payments to Plaintiff of Interim Payments from 1995 and 1998, and its payment of Interim and/or Installment Payments to other former Walgreen employees, may all be relevant to determining whether the denial of Installment Payments to Plaintiff was arbitrary and capricious.

Further, the contractual language on which Defendants rely is not so clear and unambiguous that Plaintiff's ERISA claim can be resolved as a matter of law at this early stage in the case. Defendants maintain that Plaintiff is not entitled to any Installment Payments because "he never met the Plan eligibility criteria." [10] at 11. In particular, Defendants contend that Plaintiff "terminated employment at age 32" in 1988—when Walgreens sold its Food Service Division to Marriott—and thus could not have been either "(1) continuously employed by Walgreens from January 1, 1988 until age 65 or (2) continuously employed by Walgreens from January 1, 1988 until retirement." [10] at 11 (citing Plan Art. 4.A). But Article 4.A(1)(b) does not provide, specifically, that the continuous employment must be with Walgreen; instead, it provides for benefits where "the participant retires after a period of continuous employment beginning on or before January 1, 1988." [33] at 13. Plaintiff contends that he meets this requirement, because he has been continuously employed with the Food Service Division, first at Walgreen and then with Marriott, which purchased and has continued to operate the Food Service Division since 1988. Given the contractual ambiguity and evidence that Walgreen also allegedly

believed and represented from 1988 to 2020 that Plaintiff would be entitled to Installment Payments upon retirement—as well as the allegation that at least one other employee in Plaintiff's position has received Installment Payments—the Court cannot say as a matter of law that Plaintiff has no entitlement to those payments.

Plaintiff's entitlement to a lump sum payment under Subsection 4.C(2) of the Plan is not clear cut, either. Article 4.C(2) of the Plan provides that "[a] participant whose employment with the employer is involuntarily terminated by the employer prior to the participant's retirement for reasons other than those described in Section 5 and 6 below, shall receive, as soon as practicable after such termination, a lump sum payment in the amount of the accumulated value of the deferral amount. For purposes of this Paragraph 4, Subsection C(2), the rate to be credited in the calculation of the accumulated value of the deferral amount shall be twenty percent (20%)." [1-1] at 54. Defendants claim that this Plan language "require[s] the lump sum to be calculated as of the termination date." [10] at 13. They explain that "[a]t the time of his 1988 termination, Walgreens owed Plaintiff $7,527.69," and maintain that Plaintiff received this amount and more when he was paid over $26,000 in Interim Payments (allegedly erroneously) between 1995 and 1998.

The Court cannot determine based on the Plan language alone whether Defendants' interpretation is arbitrary and capricious. Article 4.(C)(2) is ambiguous as to when the calculation of interest is to be made—at the time of termination, or the time the lump sum payment is made to the terminated employee? Defendants characterize Plaintiff as seeking an outrageous windfall by asserting that "his 1988 termination lump sum is to grow at 20% in perpetuity until paid," which would be over $2.5 million to date, and argue that "there is no basis … to suggest that Plan benefits could continue to grow after the Plan has been terminated." [10] at 12-14. But why was it reasonable for Defendants to keep Plaintiff's money for thirty-three years past his alleged

termination, without paying any interest, when Article 4.C(2) provides a rate of 20 percent interest compounded annually? After all, "[i]nterest is compensation for the time value of money," *ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 980 (7th Cir. 2016). Plaintiff lost the use of that money for decades; his loss did not cease once he was terminated. While in hindsight an interest rate of 20% compounded annually may seem extremely high, the 1980s, when Plaintiff made his contribution to the Plan, was "an era generally of high interest rates." *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 354 (7th Cir. 2012). "[W]hen long-term interest rates are high, they are high in order to compensate lenders for the fact that they will be repaid in cheaper dollars." *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199 (7th Cir. 1982).

Perhaps with more in-depth analysis of the Plan and discussion of relevant case law, the Court will be convinced of Defendants' position. But Defendants have not yet made the required showing. Based on the limited information before it, the Court cannot say as a matter of law that Defendants' interpretation of the Plan is "based on a reasonable explanation of relevant plan documents," *Siebert*, 496 F. Supp. 3d at 1157, rather than on a desire to meet Walgreens' goal of cutting more than $1.8 billion from its budget by 2022. See [1-1] at 56. Therefore, the Court declines to "rubber stamp" that interpretation without at least allowing development of the factual record and the presentation of more fulsome arguments. *Siebert*, 496 F. Supp. 3d at 1157. For these reasons, Defendants' motion to dismiss Plaintiff's ERISA claim is denied.

B.    **State Law Claims and ERISA Preemption**

In addition to the ERISA count, the Complaint alleges five counts under Illinois state law which all, at least in part, seek relief for Defendants' alleged failure and refusal to pay him benefits allegedly due under the Plan. See [1-1] at 107 (Count I, for breach of fiduciary duty of good faith

and fair dealing, alleging that Defendants "defrauded and deprived Plaintiff of the payments he is entitled to under the Plan" and caused "loss of the amounts due to him under the Plan"); *id.* at 108-109 (Count II, for fraud and deceit, alleging that Defendants made "untrue statements of material fact" to induce him to "surrender or forego his rights to money owed to him under the Plan" and "reneged on Walgreen's promise to pay" him amounts owed under the Plan); *id.* at 109 (Count III, for conversion, alleging that Defendants have "taken an unauthorized and wrongful assumption, control, dominion or ownership of funds due and owing to Plaintiff pursuant to the Plan"); *id*. at 111, for violation of the Illinois Wage Payment and Collection Act, alleging that Defendants have violated the Act by "failing to make timely and appropriate payments owed to Plaintiff pursuant to the Plan"); *id.* at 111-12 (Count V, for breach of contract, alleging that Defendants have failed to "comply with the terms of the Plan" and "violated and breached the terms of the Plan").

Defendants argue that Plaintiff's state law claims are preempted by ERISA under both the doctrine of "complete preemption" and the doctrine of "conflict preemption." Despite its name, "the complete preemption doctrine 'is not a preemption doctrine but rather a federal jurisdiction doctrine.'" *Speciale v. Seybold*, 147 F.3d 612, 615 (7th Cir. 1998) (quoting *Lister v. Stark*, 890 F.2d 941, 943 n. 1 (7th Cir. 1989)). "Complete preemption permits 'recharacterization' of a plaintiff's state law claim as a federal claim so that removal is proper." *Id*. In *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987), the Supreme Court expanded the "complete preemption" exception to include all state actions falling within the scope of § 502(a) of ERISA—the provision now codified at 29 U.S.C. § 1132(a), under which Plaintiff brings his ERISA claim. *Taylor*, 481 U.S. at 67; see also *Speciale*, 147 F.3d at 615. This provision authorizes a plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," and for

certain other specified relief. 29 U.S.C. § 1132(a). The "conflict preemption" doctrine, by contrast, "serves as a defense to a state law action but does not confer federal question jurisdiction." *Id*. Conflict preemption is based upon § 514(a) of ERISA, now codified at 29 U.S.C. § 1144. This provision "preempts any state law that 'relates to' an ERISA plan" and "routinely preempts state law claims that affect the structuring of ERISA plans, or that purport to determine the substantive rights and duties among parties to its creation and administration." *Rice v. Panchal*, 65 F.3d 637, 645 (7th Cir. 1995).

Defendants' motion to dismiss raises a threshold question of whether the Plan at issue here is, in fact, a type of employee benefit plan that is subject to ERISA. Certain types of employee benefits plans are exempt from ERISA and, therefore, not subject to ERISA preemption. See generally 29 U.S.C. § 1003. In their motion to dismiss (as well as their removal papers), Defendants assert that the Plan is a "top hat" plan, which is subject to ERISA and ERISA preemption. "A top hat plan is an unfunded plan the employer maintains 'primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees.'" *Garratt v. Knowles*, 245 F.3d 941, 946 n.4 (7th Cir. 2001) (quoting 29 U.S.C. §§ 1051(2), 1081(3), 1101(a)); see also *Olander v. Bucyrus–Erie Co*., 187 F.3d 599, 604 (7th Cir. 1999). In response to the motion to dismiss, Plaintiff challenges Defendant's categorization of the Plan, arguing instead that it is an "unfunded excess benefits plan," which "is exempt from the provisions of ERISA under 29 U.S.C. § 1003(b)(5)." *Garratt*, 245 F.3d at 945; see also *id.* at 946 & n.4 (explaining that an unfunded excess benefits plan "is not subject to either the enforcement or substantive provisions of ERISA," in contrast to a top hat plan). "The exemption recognizes that a suit concerning an unfunded plan is one directly against the employer's assets, and as ERISA leaves excess benefit plans substantively unregulated there is no reason to oust state law."

14

*Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1077 (7th Cir. 1992); see also *Gamble v. Group Hospitalization & Medical Services, Inc*., 38 F.3d 126, 132 (4th Cir. 1994) (explaining that since "ERISA does not substantively regulate such plans, its preemptive force does not oust state law" (citing *Bartholet*, 953 F.2d at 1077)).

Plaintiff's position, at first glance, appears at odds with the Complaint's inclusion of an ERISA claim under 29 U.S.C. § 1132(a)(1)(B) and federal common law. The Court is not troubled by this apparent inconsistency, however, because federal pleading rules allow claims to be brought in the alternative, even if they are inconsistent. *GC2 Inc. v. Int'l Game Technology PLC*, 255 F. Supp. 3d 812, 826 (N.D. Ill. 2017). The Court therefore turns to the proper categorization of the Plan at issue here. "The term 'excess benefit plan' means a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan." 29 U.S.C. § 1002(36). The Seventh Circuit has "read the statutory test for whether a plan is an excess benefit plan as turning on the purposes of the plan in general rather than on the specific way the plan applies to a party." *Olander*, 187 F.3d at 604. Thus, "[e]ven if a plan with other purposes has only the effect of avoiding the § 415 limitations in an individual's case, that does not mean that avoiding those limitations was the sole purpose for which the employer maintained the plan, which is the decisive consideration." *Id*. at 605; see also *Garratt*, 245 F.3d at 946.

The parties both recognize that the Plan is "unfunded," and debate only whether its "sole purpose" is to provide benefits in excess of Internal Revenue Code § 415's limitations. The Court

15

cannot resolve that question with any level of confidence based on the materials properly before it and, therefore, declines to dismiss the state law claims pursuant to Rule 12(b)(6). "*Olander* mandates that we inquire beyond the plain language contained in [the Plan] to determine whether [it] was enacted solely to avoid the limitations imposed by § 415." *Garratt*, 245 F.3d at 947 (citing *Olander*, 187 F.3d at 603). Defendants are therefore incorrect that they are entitled to dismissal simply because—in their view—the "plain language of the Plan demonstrates that it is not an excess benefit plan." [34] at 6. In fact, the Plan's purpose is not clear from its plain language, as the Plan never states *what* its purpose is. This stands in contrast to *Garratt*—where the plan "state[d] as its purpose the intent to avoid limitations on benefits imposed by *any provisions* of the Code," 245 F.3d at 947, and *Olander*, where the plan "stated three distinct purposes, one of which was to avoid the limitations imposed by § 415 of the Internal Revenue Code," *Garratt*, 245 F.3d at 947 (citing *Olander*, 187 F.3d at 603). And even in those cases the appellate court required going beyond the plain language itself to determine the proper classification of the benefits plan.

Defendants point to the opening paragraph of the Plan, which states: "Walgreen Co. (the 'employer') hereby establishes a non-qualified deferred compensation program for certain of its employees as described herein." [1-1] at 26; see [34] at 5-6. They maintain that the Plan's generic description of itself as "non-qualified" "evinces a desire to avoid all requirements of qualified plans under the Internal Revenue Code," [34] at 5, and cite in support 26 U.S.C. § 401, which, according to Defendants, "describ[es] requirements for qualified trusts." *Id*. The Court has reviewed the cited statute but fails to comprehend, without further explanation from Defendants, how it proves that the purpose of the Plan at issue here could not, as a matter of law, be solely to avoid the limitations of § 415. Defendants also point to a letter, which was attached to their removal motion, that Walgreens purportedly sent to the U.S. Department of Labor in July 1988,

16

which it claims "register[ed] the Plan with the DOL as an ERISA governed top-hat plan." [34] at 6. The letter lists the Plan as one several plans that it "currently maintains … for the purpose of providing deferred compensation for a select ground of management or highly compensated employees." [1-3] at 2. However, the letter is not properly before the Court on Defendants' Rule 12(b)(6) motion because it is not attached to the Complaint or referred to in it and Defendants have made no attempt to show that it is the type of document that is "properly subject to judicial notice." *O'Brien*, 955 F.3d at 621.

It may well be that, after being given a chance to conduct discovery, Plaintiff will be unable to point to any evidence that the Plan was enacted solely to avoid the limitations imposed by § 415. But the Court is not able to decide that now based on the limited materials and analysis provided by the parties. Further, the state-law counts of the Complaint "are simply alternative legal theories that undergird the same set of facts" that the Court has already found sufficient to support the ERISA count; all six counts are part of the same "claim" for purposes of Rule 12(b)(6). "The time to challenge the viability of additional, or alternative, legal theories is at summary judgment pursuant to Rule 56 (permitting motions as to claims or parts of claims) rather than Rule 12(b)(6) (permitting only the dismissal of claims)." *Kyle v. Brennan*, 2020 WL 1330371, at *5 (N.D. Ill. Mar. 23, 2020); see also *KFC Corp. v. Iron Horse of Metairie Road, LLC*, 2020 WL 3892989, at *3 (N.D. Ill. July 10, 2020). At that point, the parties will have had the benefit of discovery and may even be able to agree on the proper classification of the Plan.

## C. Newport

Finally, Defendants argue—in their reply brief only—that Plaintiff cannot maintain an ERISA claim against Newport because it is the Plan recordkeeper, rather than a payor of Plan benefits. See [34] at 14. Arguments raised for first time in a reply brief are typically waived. See

17

*Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 636 (7th Cir. 2018); *Tata Int'l Metals, (Americas) Ltd. v. Kurt Orban Partners, LLC*, 482 F. Supp. 3d 737, 751, n.3 (N.D. Ill. 2020). Newport (after initially failing to respond to the complaint, see [24] and [32]) chose to join in the Walgreen Defendants' motion to dismiss, see [28]. If that motion did not contain all the arguments Newport wanted to make, Newport should have filed its own motion rather than inserting a wholly new argument into the reply. "Loading-up in a reply brief effectively results in a one-sided presentation, which is hopelessly inconsistent with the very premise on which the adversary system is based. In addition to being unfair to one's opponent, the tactic of saving what is claimed to be significant for last adversely affects the accuracy of the judicial process, which depends on comprehensive presentations by both sides." *Monco v. Zoltek Corp.*, 317 F. Supp. 3d 995, 1001 n.3 (N.D. Ill. 2018). Therefore, the Court declines to consider the parties' final argument.

## IV.    Conclusion

For these reasons, Defendants' motion to dismiss [9] is denied. Plaintiff's joint status report, which should include a discovery plan and statement regarding settlement discussions to date and settlement potential, is due by August 3, 2021.

Dated: July 20, 2021

_____
Robert M. Dow, Jr.
United States District Judge